## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| SALLY A. SCHELL, | Case No. |
| Plaintiffs, | |
| v. | |
| AMERICAN CYLINDER CO., INC., | |
| Defendants. | Jury Trial Demanded |

**FILED**

**JANUARY 16, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**PH**   **08 C 365**

**JUDGE COAR**
**MAGISTRATE JUDGE DENLOW**

## COMPLAINT

Plaintiff Sally A. Schell ("Ms. "Schell"), by her attorney, sets forth the following as her Complaint against Defendant American Cylinder Co., Inc. ("Defendant"):

### Parties

1)      Ms. Schell, a female, is a citizen of the United States and the State of Illinois who resided in the Northern District of Illinois at all relevant times.

2)      Defendant American Cylinder Co., Inc. is a Delaware Corporation whose principal place of business is Will County, Illinois.  Among other things, Defendant manufactures air cylinders primarily used to move mechanical parts (similar to hydraulic cylinders).   Defendant is an "employer" as defined by Title VII.

### Summary of Allegations and Claims

3)      From practically her first day working for Defendant, Ms. Schell's coworker, Gary Messier, and her supervisor, Cliff Buchmeier, harassed Ms. Schell and created a hostile work environment.

4)      Messier's near harassment primarily was based on Ms. Schell's gender. Messier thought Ms. Schell was treated favorably because she was a woman and, as a result, made Ms. Schell's working conditions miserable by harassing her on virtually a daily basis.

5)      Ms. Schell placed Defendant on notice of Messier's harassment by repeatedly complaining to Supervisor Buchmeier and other members of management or acting supervisors.

6)      Supervisor Buchmeier's daily harassment of Ms. Schell also was based on her gender, but was more sexual in nature.    Supervisor Buchmeier routinely inappropriately touched Ms. Schell and made inappropriate comments to and about Ms. Schell, including asking her to perform sex acts.  Ms. Schell feared she would be fired if she complained about Supervisor Buchmeier's harassment.

7)      Ultimately, the harassment Ms. Schell was experiencing became so unbearable she felt she had no choice but to resign.  On approximately November 30, 2005, Ms. Schell submitted a resignation letter to Defendant's President and Chief Executive Officer ("CEO") Joseph White.

8)      Later the same day, s. Schell asked CEO White for her resignation letter back.  But CEO White refused to allow Ms. Schell to take back her resignation.

9)      CEO White's refusal to allow Ms. Schell to take back her resignation letter and Defendant's actions in terminating Ms. Schell's employment were motivated by her gender, her complaints about Messier's harassing behavior and the fact that she had filed a workers' compensation claim.

10)     Defendant violated Title VII of the Civil Rights Act of 1964, as amended, by harassing Ms. Schell on the basis of her sex and/or gender, retaliating against her and terminating her employment or, alternatively, constructively discharging her.

11)     Defendant also violated Illinois common law by terminating Ms. Schell or, alternatively, constructively discharging her because she exercised her rights under the Illinois Workers' Compensation Act.

## EEOC Finding Of Reasonable Cause

12)     Ms. Schell filed an EEOC charge against Defendant on March 16, 2006.  A copy of Ms. Schell's EEOC charge is attached as Exhibit A.

13)     The EEOC issued a Notice of Right to Sue on October 18, 2007.

14)     The EEOC found reasonable cause to believe that Defendant violated Title VII.  A copy of the Notice of Right to Sue is attached as Exhibit B.

15)     This Complaint was filed within ninety days of October 18, 2007.

## Background

16)     Defendant operates a factory at 481 Governors Highway, Peotone, Illinois 60468 ("the Peotone factory").

17)     Joseph White is Defendant's President and Chief Executive Officer ("CEO").

18)     Defendant employed Ms. Schell at its Poetone factory from approximately June 6, 2000, through approximately December 1, 2005.

19)     Throughout Ms. Schell's employment, Defendant employed Cliff Buchmeier as a Supervisor.

20)     Supervisor Buchmeier oversaw two departments:  the Rod & Tubing Department and the Drilling Department.

21)     Throughout her employment with Defendant, Ms. Schell worked in the Drilling Department.  Ms. Schell's assigned position was "Drill Operator."

22)     As a Drill Operator, Ms. Schell's primary responsibility was to operate a drill press used to cut holes in parts of the cylinders Defendant manufactured.  Ms. Schell also occasionally ran a mill saw used for cutting metal.

23)     Ms. Schell was the only woman who worked in the Drilling Department throughout all but a few months of her employment with Defendant.

24)     Ms. Schell reported directly to Supervisor Buchmeier throughout her employment with Defendant.

25)     Throughout Ms. Schell's employment, she met or exceeded Defendant's expectations for performance.  During her employment, she cut or drilled thousands if not millions of metal parts and only very rarely were any problems identified with her drilling or cutting.

26)     Throughout Ms. Schell's employment, Defendant also employed Gary Messier.

27)     When Ms. Schell was hired in approximately June 6, 2000, Messier worked in the Drilling Department as a Drill Operator.  Messier continued to work in the Drilling Department until approximately June 2005.

4

**Allegations Of Harassment By Messier**

28)    Throughout Ms. Schell's employment, Gary Messier, harassed and intimidated Ms. Schell based on her gender.

29)    For example, Messier repeatedly commented to Ms. Schell and her coworkers on the frequency and duration of Ms. Schell's bathroom breaks. Messier repeatedly, rudely and angrily asked Ms. Schell questions like "why do you go to the bathroom so much?" and "why do you take so long in the bathroom?"

30)    As a result of a medical condition, Ms. Schell often needed longer and more frequent bathroom breaks than her male coworkers. Ms. Schell attempted to explain this to Messier on multiple occasions.  But Messier always responded with comments like "so you're female – see a doctor" or "why don't you go to the doctor?"

31)    Messier also made comments about the fact that Ms. Schell was allowed to use a chair at work.  Specifically, Messier repeatedly made comments like "I can stand for eight hours – why the hell can't she?"

32)    In addition to making comments like these to Ms. Schell, Messier also made inappropriate comments to Ms. Schell's coworkers and supervisor on virtually a daily basis.  For example, on one occasion, shortly before Ms. Schell was scheduled to go on vacation, Messier remarked "don't worry, we only have one more day with her here" as Ms. Schell walked away from Messier.

33)    Messier also routinely intimidated Ms. Schell in front of her coworkers. For example, on one occasion Ms. Schell and her male coworkers were laughing in sight of Messier.   Although Ms. Schell was with her male coworkers, Messier stormed

towards Ms. Schell and angrily – almost yelling – asked, "do you have a problem with me?" When Ms. Schell explained she and her coworkers were laughing about something else, Messier quickly snapped back, "you better not" and walked away in a huff.

34)    Messier engaged in other types of harassment with the goal of making Ms. Schell's work environment more difficult or unbearable. For example, when Messier knew assignments he was given needed to be completed by a certain time in order for Ms. Schell to complete the next step in the production process, Messier would deliberately work slowly and blame the lack of completion of the project on Ms. Schell.

35)    Additionally, Messier would needlessly complain about Ms. Schell's music and turn off her stereo. On one occasion, Messier turned her speakers towards other coworkers and – in so doing – ripped the speaker wires from the stereo.

36)    Messier also made inappropriate sexual comments that Ms. Schell reasonably found offensive and harassing. For example, in the presence of Ms. Schell and another coworker, Messier spoke of having sex with his wife. He then stated "if I had a seventeen inch penis, I wouldn't need my wife … I could just do myself." Ms. Schell understood Messier was referring to having sex with himself.

37)    Messier also made Ms. Schell's working conditions difficult by staring at her, sneering at her, refusing to acknowledge her while in her presence, and engaging in other behavior which a reasonable person would find harassing.

38)    Ms. Schell reasonably found Messier's conduct harassing and unwelcome. She repeatedly asked him to stop engaging in the conduct she found harassing.

39)    Ms. Schell also complained about Messier's harassment Defendant's management and supervisors.

40)    Specifically, Ms. Schell formally complained to Supervisor Buchmeier about Messier in approximately 2002. In response, Defendant failed to take steps to prevent Messier from continuing to harass Ms. Schell. Specifically, Supervisor Buchmeier asked Ms. Schell, "what do you want me to do about it?" – implying Defendant was powerless to change Messier's behavior.

41)    Ms. Schell formally complained to Supervisor Buchmeier again about Messier's harassment in approximately 2003. Again Defendant failed to take steps to prevent Messier from continuing to harass Ms. Schell.

42)    Messier engaged in the types of behaviors described above both before and after Ms. Schell complained about his harassing behavior.

43)    In approximately December 2004, Ms. Schell was sitting at a desk preparing paperwork should would need to complete as part of her duties prior to the start of her shift. CEO White approached Ms. Schell and falsely accused her of taking too much time to complete her work assignments and spending too much time sitting at the desk doing paperwork. CEO White criticized Ms. Schell despite the fact that she had arrived early to work and begun working before her shift, which she did often.

44)    As another act of harassment and retaliation, CEO White told Ms. Schell he was going to assign Messier to monitor whether she was completing her work responsibilities.

45)    CEO White knew about Ms. Schell's complaints of harassment by Messier when he assigned Messier to monitor Ms. Schell in approximately December 2004.

46)    Messier continued to harass Ms. Schell as alleged above after December 2004.

47)    In approximately June 2005, Messier cornered Ms. Schell at the Peotone factory.    Ms. Schell had been working with Paul Zakrzewski, Defendant's Quality Control Officer, to ensure her drill was calibrated correctly.

48)    After Zakrzewski left the area, Messier approached Ms. Schell, blocking her exit.  Ms. Schell was prevented from moving by Messier (who was facing her), the drill (which was behind her) and two work tables (which were on each side of her).

49)    Chest-to-chest with Ms. Schell, Messier angrily shouted at Ms. Schell, stating that she was stupid, ignorant and he did not understand why she got special treatment.  Messier shouted so loudly, employees on the far end of the Peotone factory could hear him.

50)    Intimated by Messier and fearful of what else he might do, Ms. Schell began to cry.

51)    Supervisor Buchmeier was on vacation during the incident.  Jim Bilgri was Defendant's acting supervisor during his absence.

52)    Ms. Schell again formally complained about Messier's behavior, this time to acting supervisor Bilgri.

53) Acting supervisor Bilgri took notes during his conversation about the incident with Ms. Schell. Bilgri informed Supervisor Buchmeier about the incident upon his return from vacation.

54) In approximately June 2005, Defendant transferred Messier out of Ms. Schell's department.

55) After Messier transferred out of Ms. Schell's department, Ms. Schell had no further direct contact with Messier. Although Ms. Schell and Messier continued to work in the same building, Ms. Schell did her best to avoid coming into contact with Messier.

56) After Messier was transferred out of Ms. Schell's department, Messier still continued to harass Ms. Schell by, among other things, continuing to make negative comments about Ms. Schell to her coworkers and supervisor.

57) Additionally, on occasions when Ms. Schell and Messier would pass, Messier would continue to engage in behavior Ms. Schell reasonably considered harassing.

58) Throughout Ms. Schell's employment with Defendant Messier harassed Ms. Schell because of her gender and/or sex. Messier perceived that Ms. Schell was given special treatment (like a chair or longer bathroom breaks) because she was a woman and, therefore, resented her.

59) Messier did not treat his male coworkers in the harassing way he treated Ms. Schell.

60)    Ms. Schell did not find Messier's treatment welcome in any fashion.  She took reasonable steps to oppose Messier's behavior towards her, including repeatedly telling him to stop engaging in behavior she found harassing and complaining to Defendant's management both formally and informally.

### Allegations Of Harassment By Supervisor Buchmeier

61)    Supervisor Buchmeier also contributed to the hostile environment in which Ms. Schell worked. Throughout her employment with Defendant, Supervisor Buchmeier harassed Ms. Schell – both verbally and physically – on a near daily basis.

62)    Supervisor Buchmeier would touch Ms. Schell inappropriately almost daily.  Specifically, these touchings included Supervisor Buchmeier fondling Ms. Schell's hands by rubbing his fingers in Ms. Schell's palm as he gave her work assignments.  Supervisor Buchmeier also repeatedly rubbed up against Ms. Schell or leaned up against her, inappropriately touching her buttocks or breasts.

63)    Supervisor Buchmeier also repeatedly untied Ms. Schell's work apron and snapped her brazier strap.  On other occasions, Buchmeier attempted to pour water on Ms. Schell's shirt, spit water at her to wet her shirt and allowed her to be squirted with squirt guns.  These touchings continued on a routine basis throughout Ms. Schell's employment with Defendant.

64)    Additionally, Supervisor Buchmeier made inappropriate, sexual comments to Ms. Schell on a routine and virtually daily basis.  For example, after Ms. Schell inquired about additional work assignments, Supervisor Buchmeier remarked

that he had work for Ms. Schell, and then told her to "get on your knees." Ms. Schell reasonably understood Supervisor Buchmeier was asking her to perform oral sex.

65)    Supervisor Buchmeier also repeatedly made other inappropriate remarks that Ms. Schell reasonably understood to be requests for sex. For example, early in Ms. Schell's employment and repeatedly thereafter, Supervisor Buchmeier specifically asked Ms. Schell "when are we going to have sex?" Additionally, Supervisor Buchmeier repeatedly made remarks like "my wife is going on vacation, can I come over?"

66)    Supervisor Buchmeier also made rude and obscene gestures towards Ms. Schell throughout her employment. For example, Supervisor Buchmeier often stuck his tongue out towards Ms. Schell and moved it in a circular and up and down fashion. Ms. Schell reasonably understood Supervisor Buchmeier was mimicking a man performing oral sex on a woman.

67)    Supervisor Buchmeier also routinely made inappropriate, sexual comments about Ms. Schell to her coworkers.

68)    At one point in approximately late 2003 or early 2004, Supervisor Buchmeier threatened Ms. Schell as a further act of harassment. Ms. Schell was developing carpel tunnel syndrome as a result of performing her job duties for Defendant. Occasionally, the pain she experienced in her wrist was visible to others.

69)    Once, when Supervisor Buchmeier noticed Ms. Schell in pain, he walked over to her with his large pocket-knife out. He opened the blade and remarked, "I know how to fix your wrists." Supervisor Buchmeier then made a cutting motion over Ms. Schell's wrists, mimicking slitting the veins in her wrists.

70)    Supervisor Buchmeier repeatedly used his knife inappropriately in a way that made Ms. Schell fearful.  For example, Supervisor Buchmeier would take the knife out, open it, and pretend to poke Ms. Schell with the blade.  Supervisor Buchmeier did not engage in similar behavior towards men.

71)    Based on Supervisor Buchmeier's conduct with his pocket-knife, Ms. Schell reasonably feared Supervisor Buchmeier might physically harm her.

72)    Supervisor Buchmeier also routinely made light of Ms. Schell's carpel tunnel syndrome in a sexual way.  On several occasions when Supervisor Buchmeier saw Ms Schell in pain, he would remark in a suggestive tone, "I know how to make your wrists feel better."  Ms. Schell reasonably understood Supervisor Buchmeier was implying he could make her wrists feel better by having sex or engaging in sex acts with her.

73)    Supervisor Buchmeier also explained that complaining about his sexual harassing behavior was futile.  Specifically, Supervisor Buchmeier said Ms. Schell could never prove sexual harassment because it was Ms. Schell's "word against [his]."

74)    Ms. Schell never complained about Supervisor Buchmeier's harassment because she feared she would lose her job and believed Defendant would refuse to reprimand Supervisor Buchmeier.

75)    Ms. Schell spoke with coworker Mark Van Vleck about Buchmeier's harassment and whether she should complain.  Van Vleck agreed with Ms. Schell that if she complained to CEO White, he would not do anything about it.

76)    Ms. Schell did not find Supervisor Buchmeier's behavior welcome in any fashion.  She took reasonable steps to oppose Supervisor Buchmeier's behavior towards her by asking Supervisor Buchmeier to stop.  She also made her opposition to his behavior clear by, for example, quickly pulling her hands away when he would try to rub them inappropriately and refusing his repeated requests for sex.

77)    Ms. Schell understood she was not the first woman Supervisor Buchmeier harassed.  Prior to being employed by Defendant, Supervisor Buchmeier worked for Bimba Manufacturing, a manufacturing company similar to Defendant.  Ms. Schell heard from a coworker that Supervisor Buchmeier was alleged to have harassed a female employee when he was employed at Bimba Manufacturing.  Ms. Schell also heard from a coworker that the reason for Supervisor Buchmeier's departure from Bimba Manufacturing was the result of a complaint of sexual harassment against him.

78)    Based on her conversations with coworkers and her observations of Defendant's workplace during her employment, Ms. Schell also believes other current and former female employees of Defendant have been and/or are being harassed based on their sex and/or gender.

## Ms. Schell's Workers' Compensation Claim

79)    As a result of operating a drill press for Defendant, Ms. Schell developed carpel tunnel syndrome in her right hand.  Ms. Schell's repetitive trauma injury required Ms. Schell to have surgery and miss work.

80)    Ms. Schell exercised her right to recover for her work injury under the Illinois Workers' Compensation Act.    Specifically, Ms. Schell filed a workers' compensation claim that she settled with Defendant in approximately June 2005.

81)    As a result of Ms. Schell exercising her rights under the Illinois Workers' Compensation Act, Defendant incurred additional financial costs and had to complete additional administrative tasks, including substantial paperwork.

82)    Throughout the summer of 2005, Ms. Schell attempted to return to work with certain medical restrictions authorized by her physician, by Defendant refused to allow Ms. Schell to return to work.

83)    In approximately early September 2005, Defendant claimed it had no work Ms. Schell could perform with her medical restriction.    Ms. Schell returned to work in approximately late summer or early fall 2005.

## Ms. Schell's Constructive Discharge

84)    After Ms. Schell returned from leave related to her work-related injury, she continued to experience a hostile work environment based on her gender and/or sex and/or retaliation for complaining about harassing behavior.

85)    Ms. Schell's hostile work environment became unbearable as a result of Defendant's, Messier's and Supervisor Buchmeier's continuing harassment.    Ms. Schell felt as though Defendant was trying to force her to quit.

86)    In approximately November 2005, Supervisor Buchmeier informed Ms. Schell that he was going on vacation.    Supervisor Buchmeier asked Ms. Schell if she would serve as temporary supervisor during his absence.

14

87)     Damaged by years of harassment, Ms. Schell declined.

88)     Supervisor Buchmeier made it clear he wanted Ms. Schell to act as supervisor, forcefully asking her to do it.  Ms. Schell again declined.

89)     Aware of Ms. Schell's history with Messier, Supervisor Buchmeier remarked that he would "have" to give the temporary supervisor assignment to Messier since Ms. Schell refused.  Supervisor Buchmeier could have chosen any of a number of other employees to act as temporary supervisor, but said he would chose Messier as yet another act of harassment and retaliation towards Ms. Schell.

90)     Ms. Schell informed Supervisor Buchmeier that if he assigned Messier as her temporary supervisor, she would have no choice but to resign.

91)     Rather than allowing Ms. Schell and Messier to continue to work in different departments, Supervisor Buchmeier said he still intended to assign Messier as her temporary supervisor.

92)     Ms. Schell reasonably felt the harassment she was experiencing was more than she could endure, especially if she would be forced to report directly to Messier during Supervisor Buchmeier's absence.   As a result, Ms. Schell tendered her resignation on November 30, 2005.

93)     On approximately November 30, 2005, Ms. Schell gave a resignation letter to CEO White.

94)     When Supervisor Buchmeier learned Ms. Schell had given CEO White a resignation letter, he asked Ms. Schell to get it back from CEO White and offered to

"work something out."  Ms. Schell understood Supervisor Buchmeier was offering to assign a new temporary supervisor during his vacation.

95)     Ms. Schell tried to get her resignation letter back from CEO White, but CEO White refused to allow her to take it back.  Instead, he told Ms. Schell he had "accepted" the resignation effective December 1, 2005 (the next day).

96)     Because she needed her job to pay her bills and understood Messier would not be serving as her temporary supervisor during Supervisor Buchmeier's absence, Ms. Schell reported to work on December 1, 2005.

97)     Defendant did not allow Ms. Schell to work on December 1, 2005.  Instead, Defendant asked Ms. Schell to gather her personal belongings and escorted her from the premises.

98)     By refusing to allow Ms. Schell to rescind her resignation or work, Defendant terminated Ms. Schell's employment.

99)     Alternatively, by making her work environment so intolerable and hostile, Defendant constructively discharged Ms. Schell.

## **Jurisdiction and Venue**

100)     Ms. Schell alleges claims against Defendant under Title VII, 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991 ("Title VII"), and Illinois common law.

101)     This Court has jurisdiction over Ms. Schell's Title VII claims pursuant to 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-5(f)(3).

102)    This Court has supplemental jurisdiction of Ms. Schell's Illinois common law claims pursuant to 28 U.S.C. § 1367.

103)    Venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f)(3) and/or 29 U.S.C. § 1392(b)(2) because the alleged unlawful conduct occurred in this judicial district.

<u>**Defendant's Conduct Constitutes A Continuing Violation**</u>

104)    The harassment Ms. Schell experienced from her coworker, Gary Messier and her supervisor, Cliff Buchmeier, continued throughout her employment.  Thus, Defendant's unlawful harassing conduct towards Ms. Schell constitutes a continuing unlawful employment practice and is not a discrete act.

105)    Additionally, the events culminating in Ms. Schell's termination of employment or, alternatively, her constructive discharge continued throughout her employment.  Thus, Defendant's constructive discharge of Ms. Schell constitutes a continuing unlawful employment practice and is not a discrete act.

<u>**Ms. Schell Suffered Injury As A Result Of Defendant's Conduct**</u>

106)    As a result of Defendant's unlawful conduct, Ms. Schell was denied equal employment opportunities.

107)    As a result of Defendant's unlawful conduct, Ms. Schell also lost past and future wages and other benefits (including profit sharing under Defendant's profit-sharing plan).  She also suffered embarrassment, humiliation, loss of dignity, and her career was irreparably damaged as a result of Defendant's unlawful conduct.

108)   As a result of Defendant's unlawful conduct and its efforts to oppose unemployment compensation benefits for Ms. Schell, Ms. Schell also now owes the State of Illinois for unemployment compensation benefits she received.

109)   Defendant's actions also caused Ms. Schell to incur attorneys' fees and costs.

## COUNT I
## Hostile Work Environment Based On Gender And/Or Sex Under Title VII

110)   Ms. Schell repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

111)   Ms. Schell's gender and/or sex was a motivating factor in the harassing behavior by Messier and Buchmeier that resulted in the hostile work environment she experienced.

112)   Defendant's harassing conduct was severe and pervasive.

113)   Ms. Schell took reasonable steps to oppose the harassment she was experiencing.

114)   Ms. Schell complained about Messier's harassing behavior.

115)   Although Defendant was on notice of the harassment by Messier and Buchmeier, it failed to take prompt and effective remedial action sufficient to prevent the harassment from continuing.

116)   As a result of Defendant's actions, Ms. Schell sustained a loss of past and future wages and benefits, damage to her career, emotional distress (including, without limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

18

117)    The actions of the Defendant were intentional and/or done maliciously or with reckless indifference to Ms. Schell's rights.

WHEREFORE, Ms. Schell requests monetary and equitable relief consistent with the harm caused by the Defendant.

### Count II
### Termination Or, Alternatively, Constructive Discharge Based On Gender And/Or Sex Under Title VII

118)    Ms. Schell repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

119)    Ms. Schell's gender and/or sex was a motivating factor in the harassing behavior by Messier and Buchmeier that resulted in the hostile work environment she experienced.

120)    Although Defendant was on notice of the harassment by Messier and Buchmeier, it failed to take prompt and effective remedial action sufficient to prevent the harassment from continuing.

121)    Defendant's harassing conduct became so unbearable such that Ms. Schell reasonably believed she had no choice but to resign.

122)    Defendant's termination of Ms. Schell's employment by refusing to allow her to take back her resignation letter and/or to continue working on or after December 1, 2005, was motivated by Ms. Schell's gender and/or sex.

123)    As a result of Defendant's actions, Ms. Schell sustained a loss of past and future wages and benefits, damage to her career, emotional distress (including, without

limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

124)    The actions of the Defendant were intentional and/or done maliciously or with reckless indifference to the rights of the Ms. Schell.

WHEREFORE, Ms. Schell requests monetary and equitable relief consistent with the harm caused by the Defendant.

**Count III**
**Retaliatory Termination Or, Alternatively, Constructive Discharge Under Title VII**

125)    Ms. Schell repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

126)    By complaining about harassment by Messier, Ms. Schell engaged in protected activity under Title VII.

127)    Ms. Schell's complaints about the harassment and hostile work environment she experienced were a motivating factor for Defendant's harassing conduct towards her after her complaints.

128)    Defendant's harassing conduct became so unbearable such that Ms. Schell reasonably believed she had no choice but to resign.

129)    Defendant's termination of Ms. Schell's employment by refusing to allow her to take back her resignation letter and/or to continue working on or after December 1, 2005, was motivated by Ms. Schell's protected activity.

130)    As a result of Defendant's actions, Ms. Schell sustained a loss of past and future wages and benefits, damage to her career, emotional distress (including, without

limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

131)    The actions of the Defendant were intentional and/or done maliciously or with reckless indifference to the rights of the Ms. Schell.

WHEREFORE, Ms. Schell requests monetary and equitable relief consistent with the harm caused by the Defendant.

**Count IV**
**Retaliatory Termination Or, Alternatively, Constructive Discharge**
**In Violation Of Illinois Common Law**

132)    Ms. Schell repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

133)    Illinois public policy requires that employees be free from retaliation for attempting to exercise their rights to recover for work injuries under the Illinois Workers' Compensation Act.

134)    Ms. Schell's attempt to exercise her rights under the Illinois Workers' Compensation Act was a motivating factor in the harassing behavior by Messier and Buchmeier that resulted in the hostile work environment she experienced.

135)    Defendant's harassing conduct became so unbearable such that Ms. Schell reasonably believed she had no choice but to resign.

136)    Defendant's termination of Ms. Schell's employment by refusing to allow her to take back her resignation letter and/or work to continue working on or after December 1, 2005, was motivated by Ms. Schell's attempt to exercise her rights under the Illinois Workers' Compensation Act.

137)    As a result of the actions of the Defendant, as set forth above, Ms. Schell sustained a loss of past and future wages and benefits, damage to her career, emotional distress (including, without limitation, humiliation, embarrassment and loss of dignity), attorney fees, and related costs.

138)    The actions of the Defendant were intentional and/or done maliciously or with reckless indifference to the rights of the Ms. Schell.

WHEREFORE, Ms. Schell requests monetary and equitable relief consistent with the harm caused by the Defendant.

### Relief Sought – All Counts

139)    Ms. Schell repleads the allegations contained in all paragraphs of this complaint, and incorporates them by reference as if fully set forth herein.

140)    Defendant's unlawful employment practices under Title VII must be attacked from several directions.  Accordingly, Ms. Schell respectfully requests that the Court enter an order declaring Defendant violated Title VII and directing that Defendant:

a)  Conduct training for all managers regarding sexual harassment, Defendant's policy regarding sexual harassment, Defendant's reporting procedure for sexual harassment, and retaliation;

b)  Conduct training regarding how to prevent hidden and overt bias (including stereotypes) from impeding the advancement of women in the workplace;

c)  Establish hiring goals and timetables for increasing the number of women in Defendant's workforce;

d)  Remove Buchmeier from his supervisor position;

e)  Forbid future violations of Title VII;

f) Adopt policies aimed at preventing and remedying any future violations that may occur, including an *effective* reporting procedure and *effective* investigation procedures that prevent retaliation; and,

g) Notify employees of the violation(s) and the remedy imposed by this Court.

141)    Ms. Schell also respectfully requests that the Court order other monetary and/or equitable relief, including, but not limited to:

a) Lost past and future wages (including benefits), compensatory damages, and punitive damages;

b) Other monetary expenses incurred by Ms. Schell as a result of Defendant's conduct (including unemployment compensation benefits owed to the State of Illinois);

c) Pre-judgment interest allowed by law;

d) Attorney fees and costs (including any expert witness fees); and,

e) All other and relief that the Court may deem equitable, just or appropriate.

**JURY DEMAND**

Plaintiff demands a trial by jury of all issues raised in this Complaint.

Respectfully submitted,

/s/ J. Bryan Wood

_____
J. Bryan Wood
Attorney for Plaintiff

J. Bryan Wood  (No. 6270845)
THE LAW OFFICE OF J. BRYAN WOOD
53 W. Jackson Blvd., Ste. 660
Chicago, Illinois 60604
Telephone:  (312) 545-1420
Facsimile:  (312) 577-0749
Email:  bryan@jbryanwoodlaw.com